# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| JOHN PRICE,  DERIVATIVELY AND ON BEHALF OF  URANIUM ENERGY CORP., | ) ) ) | Case No. |
| | ) | **VERIFIED SHAREHOLDER** |
| | ) | **DERIVATIVE COMPLAINT FOR:** |
| Plaintiff, | ) ) | |
| | ) | **(1) BREACH OF FIDUCIARY DUTY;** |
| v. | ) | **AND** |
| | ) | **(2) UNJUST ENRICHMENT** |
| AMIR ADNANI, ALAN LINDSAY, IVAN OBOLENSKY, VINCENT DELLA VOLPE, DAVID KONG, GANPAT MANI, MARK KATSUMATA, SCOTT MELBYE, LEONARD GARCIA, WILLIAM R. UNDERDOWN, JR., and CLYDE LAYTON YANCEY, | ) ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| URANIUM ENERGY CORP., | ) ) | |
| Nominal Defendant. | ) ) ) | |
| | ) ) ) | |
| | ) | |

Plaintiff John Price ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Uranium Energy Corp. ("Uranium Energy" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants Amir Adnani, Alan Lindsay, Ivan Obolensky, Vincent Della Volpe, David Kong, Ganpat Mani, Mark Katsumata, Scott Melbye, Leonard Garcia, William R. Underdown, Jr., and Clyde Layton Yancey (collectively, the "Individual Defendants") for breaches of their fiduciary duties as directors and/or officers of

1

Uranium Energy and unjust enrichment for his complaint against Individual Defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Uranium Energy, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Uranium Energy's directors and officers who breached their fiduciary duties by A) engaging in a scheme to manipulate the price and trading volume of Uranium Energy's stock by using stock promoters who in some cases failed to disclose to potential investors that they had been paid by the Company to promote the purchase of the stock, by failing to disclose the use of stock promoters paid by the Company in Uranium Energy's regulatory filings pursuant to Section 17(b) of the Securities Act of 1933, and by engaging in lucrative insider sales; B) by failing to maintain for the Company adequate internal and financial controls; and C) by making false and misleading statements by failing to disclose to the investing public 1) the above scheme, 2) and that the Company lacked adequate internal and financial controls.

2.     TheStreetSweeper.org published an article on June 18, 2015 that stated that Uranium Energy was using undisclosed paid stock promoters to increase the value of Uranium Energy stock. The article stated, in pertinent part:

> UEC has been running up on promotions coming from Twitter, Seeking Alpha authors and reportedly hype paid by the company itself.

> Here is an example of a bullish tweet:



**I Know First** @i_Know_First · Jun 2
UEC Stock Forecast: +102.78% Since Our Last Article! ow.ly/NLnU8
#Nuclear #Algotrade $UEC

> Here is one Seeking Alpha author's bullish headline: "Uranium Energy Corp. Will Ride The Uranium Bull."

Though we prefer this SA article: "Uranium Energy Overvalued Even At $2 – Better Choices For Speculating On Uranium Abound."

And here is the hotstocked.com piece, titled: "And the Pump Initiator is … ShazamStocks Powered by Uranium Energy Corp."

3.     The hotstocked.com article referenced in the aforementioned TheStreetSweeper.org article provides links to each of 43 emails sent out by various stock promoters to mailing lists of U.S. investors throughout the period of time beginning on June 20, 2011 and ending on February 23, 2015 and were published on the stock promoters' respective websites.

4.     Each of those emails and corresponding website publications touted Uranium Energy and promoted the purchase of Uranium Energy stock.

5.     All of the 43 emails and their corresponding website publications were paid for by Uranium Energy directly or indirectly.

6.     Only some of the 43 emails stated that the senders of those emails (the "Stock Promoters") were paid by Uranium Energy to write and send them and publish the information in the emails on their respective websites.

7.     Many of the 43 emails stated that the Stock Promoters were paid by third parties other than Uranium Energy to write and send them and publish the information in the emails on their respective websites.

8.     Some of the 43 emails stated that the Stock Promoters were paid by third parties, without disclosing the identity of the third parties, to write and send them and publish the information in the emails on their respective websites.

- 4 -

9.      The 43 emails reveal that the Stock Promoters were paid at least $361,900 to write and send them and publish the information in the emails on their websites.

10.     Many of the same Stock Promoters used a variety of different names and websites in order to make it appear to the investing public that there were a vast number of reporters that considered the purchase of Uranium Energy stock to be a great deal.

11.     Before the fraud was exposed by TheStreetSweeper.org June 18, 2015 article, Defendants Adnani, Garcia, Underdown, and Yancey made lucrative insider sales on non-public-information.

12.     Their insider sales before the fraud was exposed demonstrates their motive in facilitating and participating in the fraud.

13.     As the Company was paying the Stock Promoters without the Company disclosing it, and, as, in some cases, the Stock Promoters were not disclosing their being paid by the Company, the Individual Defendants caused the Company to do business with the Stock Promoters and thus had to have known about the fraud.  If any of the Individual Defendants did not have actual knowledge of the fraudulent scheme, they deliberately turned a blind eye to it.

14.     The most plausible inference is that the fraud alleged herein was widespread and systemic at the Company, and that all of the Individual Defendants knowingly engaged in, facilitated, concealed, and failed to disclose the fraud, or at least recklessly turned a blind eye to it.

15.     As a result of the Individual Defendants' illicit scheme and false and misleading statements, the price of Uranium Energy stock plummeted from $2.57 per share when trading

opened on June 18, 2015 to $1.50 during intraday trading on June 19, 2015, and closed at $1.80 on June 19, 2015.

16.     The Company stock price closed at $1.25 per share on August 5, 2015.

17.     The Individual Defendants' breaches of fiduciary duty have subjected the Company, the Company's Chief Executive Officer who was also its President, one of its Directors, and a 3.2% shareholder, and the Company's Chief Financial Officer to a federal securities fraud class action lawsuit, to the need to undertake internal investigations, to losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company and of certain Individual Defendants who received ill-gotten gains from insider selling, and will cost the Company going forward many millions of dollars.

18.     The Company has been substantially damaged as a result of the Individual Defendants' knowing breaches of fiduciary duty and other misconduct.

19.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants who are the Company's current Directors, of the substantial likelihood of their liability in this derivative action and in the federal securities law class action lawsuit, of their not being disinterested and/or independent Directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

20.     Diversity jurisdiction is conferred by 28 U.S.C. § 1332.  Plaintiff and Individual Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

21.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or is an individual who is a citizen of Texas or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

22.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

23.     Plaintiff is a current shareholder of shares of Uranium Energy.  Plaintiff has continuously held Uranium Energy common stock at all relevant times.  Plaintiff is a citizen of Iowa.

### Nominal Defendant Uranium Energy

24.     Nominal Defendant Uranium Energy is a Nevada corporation with principal offices located in this District at 500 North Shoreline Boulevard, Suite 800N, Corpus Christi, Texas 78401.  Uranium Energy engages in the exploration, extraction, and processing of uranium concentrates on projects located in the United States and the Republic of Paraguay. As of July 31, 2014, it had mineral rights in uranium projects located in the states of Arizona, Colorado, New Mexico, Texas, and Wyoming, as well as in the Republic of Paraguay. The company was formerly known as Carlin Gold Inc. and changed its name to Uranium Energy Corp. in January

2005.  The Company's shares trade on the NYSE MKT Equities Exchange ("NYSE").  Uranium Energy is a citizen of Texas and Nevada.

**Defendant Adnani**

25.     Defendant Amir Adnani ("Adnani") is the Company's co-founder and has served as the Company's President and Chief Executive Officer and as a Company Director since January 2005.  According to the Company's Schedule 14A filed with the SEC on June 19, 2015 (the "2015 Proxy Statement"), as of June 15, 2015, Defendant Adnani beneficially owned 3.01 million shares of the Company's common stock, which is 3.2% of the Company's issued and outstanding common stock.  For the fiscal year ended July 31, 2014, Defendant Adnani received $640,000 in cash as compensation from the Company.  For the fiscal year ended July 31, 2013, Defendant Adnani received $567,251 in cash as compensation from the Company.  For the fiscal year ended July 31, 2012, Defendant Adnani received $842,387 in compensation from the Company, of which amount $185,382 was in stock options and the balance was in cash.

26.     The Company's 2015 Proxy Statement stated the following about Defendant Adnani:

> Under his leadership, Uranium Energy Corp. moved from concept to initial production in the U.S. in five years, and has developed a pipeline of low-cost, near-term production projects.
>
> Mr. Adnani has been invited to speak at prominent industry conferences organized by the International Atomic Energy Agency, World Nuclear Fuel Market and the Milken Institute. He is a frequent contributor to the business media including *The Wall Street Journal*, Bloomberg, CNBC and Fox Business News.
>
> *Fortune* magazine distinguishes Mr. Adnani on their "40 Under 40, Ones to Watch" list of North American executives. He is recognized by a qualified resource industry investment advisory, Casey Research, as one of the sector's leading entrepreneurs and executives, a list researched and known as "Casey's NexTen." He is a nominee for Ernst & Young's "Entrepreneur of the Year" distinction.

- 8 -

Mr. Adnani is the founder and Chairman of Brazil Resources Inc., a publicly-listed gold development and acquisition company.  In addition, since June 2014, he has served as a director of Garnero Group Acquisition Company, a NASDAQ listed special purpose acquisition company (SPAC) which completed a $144 million IPO in 2014. Mr. Adnani holds a Bachelor of Science degree from the University of British Columbia and serves on the university's Alumni Advisory Board.

The Board of Directors has concluded that Mr. Adnani should serve as a director given his involvement with the Company since its inception and his experience in the uranium industry.

27.    During the period of time when the fraudulent stock promotion scheme occurred and before the fraud was exposed on June 18, 2015, Defendant Adnani made the following sales and purchases of Company stock.  On January 9, 2013, Defendant Adnani sold 45,000 shares of Company stock for $2.52 per share.  On January 10, 2013, Defendant Adnani sold 20,000 shares of Company stock for $2.52 per share.  On January 11, 2013, Defendant Adnani sold 29,621 shares of Company stock for $2.46 per share.  On January 23, 2013, Defendant Adnani sold 35,000 shares of Company stock for $2.49 per share.  On January 24, 2013, Defendant Adnani sold 22,000 shares of Company stock for $2.42 per share.  On January 25, 2013, Defendant Adnani sold 2,800 shares of Company stock for $2.41 per share.  On April 15 2015, Defendant Adnani purchased 10,000 shares of Company stock for $1.50 per share.  On April 21, 2015, Defendant Adnani purchased 10,000 shares of Company stock for $1.77 per share.  On May 1, 2015, Defendant Adnani purchased 7,000 shares of Company stock for $2.38 per share.  On May 6, 2015, Defendant Adnani purchased 7,000 shares of Company stock for $2.32 per share.  Thus, in total, Defendant Adnani made net sales before the fraud was exposed for a total of 120,421 shares of Company stock from which he received net proceeds (less payment for 34,000 shares he purchased) in the amount of $318,178.

28.     His insider sales made with knowledge of material non-public information before the fraud was exposed demonstrates his motive in facilitating and participating in the fraud.

29.     Upon information and belief, Defendant Adnani is a citizen of Canada.

**Defendant Lindsay**

30.     Defendant Alan Lindsay ("Lindsay") is the Company's co-founder and has served as the Company's Chairman since December 2005.  According to the 2015 Proxy Statement, as of June 15, 2015, Defendant Lindsay beneficially owned 2.49 million shares of the Company's common stock, which is 2.7% of the Company's issued and outstanding common stock.  During the year ended July 31, 2014, Defendant Lindsay received $112,000 in compensation from the Company, of which amount $40,000 was in stock and the balance was in cash.

31.     The 2015 Proxy Statement stated the following about Defendant Lindsay:

Mr. Lindsay continues to serve as Chairman and a director of Bullfrog Gold Corp. listed on the OTCBB since July 2011. Mr. Lindsay was a co-founder of TapImmune Inc., a development stage biotechnology company, and served as Chairman and a director from December 2005 to July 2009, and was also a co-founder of Strategic American Oil Corporation (now known as Hydrocarb Energy Corp.), and served as an officer and director from April to July 2005 and from April 2007 to December 2010.

Mr. Lindsay was a founder of Azco Mining Inc. (now known as Santa Fe Gold Corp.) and served as Chairman, President and Chief Executive Officer from 1992 to 2000. Azco Mining Inc. was listed on the Toronto Stock Exchange in 1993 and on the American Stock Exchange in 1994. Mr. Lindsay was a co-founder of Anatolia Minerals Development Limited (now known as Alacer Gold Corp.) and New Oroperu Resources Inc., two publicly traded companies with gold discoveries and listed on the Toronto Stock Exchange and the TSX Venture Exchange (the "**TSX-V**"), respectively. Mr. Lindsay served as a director of Terra Firma Resources Inc. listed on the TSX-V from August 2011 to July 2013. From 2005 to 2008, Mr. Lindsay served as a director of Hana Mining Ltd., a formerly public company listed on the TSX-V.

The Board of Directors has concluded that Mr. Lindsay should serve as a director given that he is one of the co-founders of the Company and his involvement with the Company since its inception, and also given his business experience with other public companies.

- 10 -

32.     Upon information and belief, Defendant Lindsay is a citizen of Texas.

**Defendant Obolensky**

33.     Defendant Ivan Obolensky ("Obolensky") has served as a Company Director since April 2007.  Defendant Obolensky is a member of the Audit Committee, the Compensation Committee, and the Corporate Governance and Nominating Committee.  According to the 2015 Proxy Statement, as of June 15, 2015, Defendant Obolensky beneficially owned 218 thousand shares of the Company's common stock.

34.     The 2015 Proxy Statement stated the following about Defendant Obolensky:

Mr. Obolensky has over 50 years of experience in investment banking as a supervisory financial analyst, with specific expertise in the defense, aerospace, oil and gas, nuclear power, metals and mining, publishing and high technology industries. Mr. Obolensky is a senior associate of the Scott Abraham Investment Group of Raymond James & Associates, Inc. He has also been a Senior Executive with investment research orientation of several investment banks, including Sterling Grace & Co., Jesup, Josephthal & Co., Dominick and Dominick, Inc., Middendorf Colgate, CB Richard Ellis Moseley Hallgarten and Wellington Shields & Co. LLC, from November 1990 to April 2014. Mr. Obolensky is a Registered Investment Advisor and a long-time member of the New York Society of Security Analysts and the CFA Institute. He has tenure as the 21-year President of the Josephine Lawrence Hopkins Foundation. As a 33° Master Mason and a Past Grand Treasurer of the Grand Lodge of the State of New York, he has long served as Chairman of its "watchdog" Financial Oversight Committee for the Masonic Brotherhood Foundation. Professionally, he has made frequent appearances as a guest of CNBC, CNNfn and Bloomberg TV. Mr. Obolensky is also a pro-active Board Member of several financial/charitable organizations: The Children's Cancer & Blood Foundation; The Bouverie Audubon Preserve of Glen Ellen California; The Police Athletic League of New York City; and General "Blackjack" Pershing's Soldiers', Sailors', Marines', and Airmen's Club where he is also Chairman and CEO. He is a graduate of Yale University, attended Law School at the University of Virginia, and is a Lieutenant (Jg) US Naval Air Corps, USNR (Ret.). Mr. Obolensky was a factor in United States' mid-1960's vital nuclear switch-over to the highly efficient, secret and inexpensive gas centrifuge technology for the enrichment of uranium. Today, the Company is a part-beneficiary of these efforts.

The Board of Directors is pleased with Mr. Obolensky's active involvement with the Company since 2007 and in particular with his over 50 years of experience as a financial analyst in investment banking and as a dedicated expertise in nuclear power. Therefore,

- 11 -

the Board of Directors has concluded that Mr. Obolensky should serve as a director of the Company.

35.    Upon information and belief, Defendant Obolensky is a citizen of Texas.

**Defendant Della Volpe**

36.    Defendant Vincent Della Volpe ("Della Volpe") has been a Company Director since July 2007.  Defendant Della Volpe is a member of the Audit Committee, is the chairman of the Compensation Committee, and is the chairman of the Corporate Governance and Nominating Committee.   According to the 2015 Proxy Statement, as of June 15, 2015, Defendant Della Volpe beneficially owned 238 thousand shares of the Company's common stock.

37.    The 2015 Proxy Statement stated the following about Defendant Della Volpe:

Mr. Della Volpe has served as a professional money manager for over 35 years, including as a senior portfolio manager of pension funds for Honeywell Corporation and senior vice president of the YMCA Retirement fund in New York. Throughout his career Mr. Della Volpe has particularly focused on the management of energy and utility equity portfolios, and he also has experience managing venture capital investments. Mr. Della Volpe holds a Bachelor of Arts in Accounting and an MBA in finance, both from Seton Hall University. From 2006 to 2011, Mr. Della Volpe served as a director of Gold Canyon Resources, Inc., a junior natural resource company listed on the TSX-V.

The Board of Directors has concluded that Mr. Della Volpe should serve as a director given his involvement with the Company since 2007 and his over 35 years of experience in the financial industry.

38.    Upon information and belief, Defendant Della Volpe is a citizen of Texas.

**Defendant Kong**

39.    Defendant David Kong ("Kong") has been a Company Director since January 2011.  Defendant Kong is a member of the Compensation Committee, a member of the Corporate Governance and Nominating Committee, and the chairman of the Audit Committee.

According to the 2015 Proxy Statement, as of June 15, 2015, Defendant Kong beneficially owned 96 thousand shares of the Company's common stock.

40.     The 2015 Proxy Statement stated the following about Defendant Kong:

Mr. Kong serves as a director of New Pacific Metals Corp., a public company listed on the Toronto Stock Exchange since November 2010, as a director of Silvercorp Metals Inc., a public company listed on the New York Stock Exchange and the Toronto Stock Exchange since November 2011, as a director of Brazil Resources Inc., a public company listed on the TSX-V since October 2010, and as a director of New Era Minerals Inc., a public Company listed on the TSX-V since June 2014. Mr. Kong served as a director of IDM International Limited, a public company listed on the Australian Stock Exchange from November 2011 to October 2012, as a director of Channel Resources Ltd., a public company listed on the TSX-V from July 2010 to June 2012 and as a director of Hana Mining Ltd., a formerly public company listed on the TSX-V from July 2010 to February 2013, when it was privatized. Mr. Kong holds a Bachelor in Business Administration and earned his Chartered Accountant designation in British Columbia in 1978 and his U.S. CPA (Illinois) designation in 2002. Mr. Kong was a partner at Ellis Foster, Chartered Accountants from 1981 to 2004, before merging with Ernst & Young LLP in 2005, where he was a partner until 2010. Mr. Kong is a certified director (ICD.D) of the Institute of Corporate Directors.

The Board of Directors has concluded that Mr. Kong should serve as a director given his business experience, accounting and financial expertise.

41.     Upon information and belief, Defendant Kong is a citizen of Canada.

**Defendant Mani**

42.     Defendant Ganpat Mani ("Mani") has been a Company Director since June 2, 2014. According to the 2015 Proxy Statement, as of June 15, 2015, Defendant Mani beneficially owned 50 thousand shares of the Company's common stock.

43.     The 2015 Proxy Statement stated the following about Defendant Mani:

From 2009 to 2013, Mr. Mani was President and Chief Executive Officer of ConverDyn, a partnership between affiliates of Honeywell International Inc. and General Atomics, which specializes in the nuclear fuel conversion trade. During this time he also served as a director of the Nuclear Energy Institute and was a member of the U.S. Civil Nuclear Trade Advisory Committee. He is a highly experienced negotiator of contracts with major private and state-owned corporations in Asia, Europe and the U.S. Notably, Mr.

Mani negotiated the agreement for the return of uranium feed from the Metropolis conversion facility under the Megatons to Megawatts program between the U.S. and Russia. He also met with government and industry organizations as part of the U.S. Department of Commerce's multiple nuclear trade missions to India.

From 1994 to 2007, Mr. Mani held several senior marketing positions with ConverDyn, including having served as Senior Vice President. At ConverDyn, he was responsible for relations with major nuclear utilities in Asia, Europe and the U.S. and with enrichment companies in Europe and the U.S. He has prepared position papers and draft legislative language for, and represented ConverDyn in, meetings with the U.S. Departments of Commerce, Energy and State and with industry trade organizations. From 1973 to 1994, Mr. Mani worked at Honeywell International Inc. (formerly Allied-Signal Inc.), where his career spanned a variety of functional areas and product lines.

Mr. Mani holds an MBA from Rutgers University and a Bachelor of Technology Degree in Metallurgical Engineering from Loughborough University, UK.

The Board of Directors has concluded that Mr. Mani should serve as a director given his expertise and experience in the uranium industry, particularly his in-depth knowledge of the global nuclear fuel market.

44.     Upon information and belief, Defendant Mani is a citizen of Texas.

**Defendant Katsumata**

45.     Defendant Mark Katsumata ("Katsumata") has served as the Company's Secretary, Treasurer and Chief Financial Officer since January 2011.  Previously he served as a director of the Company and the Chairman of our Audit Committee from May 2009 until January 2011. According to the 2015 Proxy Statement, as of June 15, 2015, Defendant Katsumata beneficially owned 355 thousand shares of the Company's common stock.  For the fiscal year ended July 31, 2014, Defendant Katsumata received $209,895 in cash as compensation from the Company.  For the fiscal year ended July 31, 2013, Defendant Katsumata received $189,764 in cash as compensation from the Company.  During the fiscal year ended July 31, 2012, Defendant Katsumata received $309,415 in compensation from the Company, of which amount $102,990 was in stock options and the balance was in cash.

46.    The 2015 Proxy Statement stated the following about Defendant Katsumata:

Mr. Katsumata was previously the Chief Financial Officer/Vice President, Finance of Denison Mines Corp., an NYSE MKT and Toronto Stock Exchange-listed uranium developer and explorer.

Mr. Katsumata has over 20 years of senior management experience serving as the Chief Financial Officer/Vice President, Finance of a number of NYSE MKT, Toronto Stock Exchange and TSX-V-listed companies with uranium, oil and gas and base/precious metals operations. Prior to that, Mr. Katsumata was an external auditor of natural resource companies listed on senior and junior exchanges.

Mr. Katsumata has been a member in good standing of the Certified General Accountants' Association of British Columbia and Canada since 1997.

47.    Upon information and belief, Defendant Katsumata is a citizen of Canada.

**<u>Defendant Melbye</u>**

48.    Defendant Scott Melbye ("Melbye") has served as the Company's Executive Vice President since September 8, 2014.  According to the 2015 Proxy Statement, as of June 15, 2015, Defendant Melbye beneficially owned 170 thousand shares of the Company's common stock.

49.    The 2015 Proxy Statement stated the following about Defendant Melbye:

Mr. Melbye is a 31 year veteran of the nuclear energy industry having held key leadership positions in major global uranium mining companies and various industry organizations. He has passionately promoted the growth and competitiveness of the nuclear fuel cycle in making nuclear power a clean, affordable and reliable source of energy to meet the world's ever expanding needs.

As our Executive Vice President, Mr. Melbye is responsible for the uranium marketing and sales function and is a key contributor towards the achievement of the Company's strategic growth objectives. He is also Vice President Commercial of the Uranium Participation Corporation managing a publicly traded fund, which allows investors to buy and hold physical uranium. In addition, Mr. Melbye is Principal of Castle Rock Uranium LLC, a uranium investment and consulting company based in Denver, Colorado. Through June 2014, Mr. Melbye was Executive Vice President, Marketing for Uranium One, responsible for global sales activities, where he expanded the company's forward book, particularly in the emerging markets of the United Arab Emirates and China. He also supported the global investor-relations efforts of the CEO during the time the company was publically traded on the Toronto Stock Exchange. Uranium One is among the world's

- 15 -

top four uranium producers from its mines in Kazakhstan, Australia and the United States, and is the wholly-owned mining subsidiary of the Russian nuclear energy company Rosatom.

Prior to this, Mr. Melbye spent 22 years with the Cameco Group of companies, both in the Saskatoon head office and with their U.S. subsidiaries. He most recently served as President of Cameco Inc., the subsidiary responsible for managing the company's world-wide uranium marketing and trading activities (annual sales exceeding 30 million pounds U3O8 through established relationships with most global nuclear utilities). Previous experience includes uranium brokerage and trading at Nukem Inc. in New York, and nuclear fuel procurement at the Palo Verde Nuclear Generating Station in Arizona.

Mr. Melbye is a frequent speaker at nuclear industry conferences and has participated in numerous high-level, U.S. and Canadian trade missions to markets such as China, India, United Arab Emirates and Mexico. In 1999, Mr. Melbye provided expert testimony in support of Kazakhstan before the International Trade Commission in Washington, D.C., which lifted trade restrictions on Kazakh uranium in the United States. He is a past Chair of the Board of Governors of the World Nuclear Fuel Market (WNFM), and former President of the Uranium Producers of America (UPA). The UPA is the domestic uranium mining industry organization which promotes rational regulatory policy and responsible disposition of U.S. Department of Energy inventories. He was also elected to the Nuclear Energy Institute Board of Directors. Mr. Melbye has been active in grassroots Republican politics, having worked on two United States Senate races and serving on the statewide leadership team for Bush/Cheney '04. Mr. Melbye received a Bachelor of Science in Business Administration with degree specialization in International Business from Arizona State University in 1984.

50.     Upon information and belief, Defendant Melbye is a citizen of Texas.

**Defendant Garcia**

51.     Defendant Leonard Garcia ("Garcia") has served as the Company's Vice President of Land.  According to a Form 4 filed with the SEC on January 5, 2015, as of January 3, 2015, Defendant Garcia beneficially owned 200 thousand shares of the Company's common stock.

52.     According to the Company's website:

Mr. Garcia is an independent professional landman with over thirty years of experience in mineral title research, lease negotiations and acquisitions, farm-out contracts and exploration and production. Mr. Garcia has worked under contract for Sun Oil Company, Oryx Energy, Texaco,  Monsanto Exploration and Production Company, Harkins & Company, Trans Texas Energy and Kerr-McGee Oil and Gas Corp. He is a Registered

Professional Landman and a member of the American Association of Professional Landmen and the Austin Professional Landmen's Association.

53.     During the period of time when the fraudulent stock promotion scheme occurred and before the fraud was exposed on June 18, 2015, Defendant Garcia made the following sales and purchases of Company stock.  On December 16, 2013, Defendant Garcia sold 25,000 shares of Company stock for $1.73 per share.  On December 17, 2013, Defendant Garcia sold 10,000 shares of Company stock for $1.78 per share.  On December 19, 2013, Defendant Garcia sold 22,500 shares of Company stock for $1.89 per share.  On December 20, 2013, Defendant Garcia sold 40,000 shares of Company stock for $1.81 per share.  On December 26, 2013, Defendant Garcia sold 1,819 shares of Company stock for $1.90 per share.  On December 27, 2013, Defendant Garcia sold 18,181 shares of Company stock for $1.91 per share.  On December 30, 2013, Defendant Garcia sold 32,500 shares of Company stock for $2.03 per share.  On May 7, 2015, Defendant Garcia purchased 1,000 shares of Company stock for $2.19 per share.  On May 11, 2015, Defendant Garcia purchased 1,000 shares of Company stock for $2.40 per share. Thus, in total, Defendant Garcia made net sales before the fraud was exposed for a total of 148,000 shares of Company stock from which he received net proceeds (less payment for 2,000 shares he purchased) in the amount of $275,541.

54.     His insider sales made with knowledge of material non-public information before the fraud was exposed demonstrates his motive in facilitating and participating in the fraud.

55.     Upon information and belief, Defendant Garcia is a citizen of Texas.

**Defendant Underdown**

56.     Defendant William R. Underdown, Jr. ("Underdown") has served as the Company's Vice President of Production & Operations.  According to a Form 4 filed with the

- 17 -

SEC on January 5, 2015, as of January 2, 2015, Defendant Underdown beneficially owned 270 thousand shares of the Company's common stock.

57.     According to the Company's website:

Mr. Underdown has been instrumental in bringing the Hobson processing facility and Palangana project through to production.

Mr. Underdown has held senior operational positions at ISR uranium mines in  Texas since 1978, and he has extensive experience designing, managing and reclaiming ISR uranium mines.  Throughout his career, Mr. Underdown has worked with the regulatory agencies in  Texas  specifically pertaining to ISR uranium production, and this includes the responsibilities of managing hundreds of mine personnel and looking after their safety and that of the environment.

58.     During the period of time when the fraudulent stock promotion scheme occurred and before the fraud was exposed on June 18, 2015, Defendant Underdown made the following sales and purchases of Company stock.  On October 18, 2012, Defendant Underdown sold 4,234 shares of Company stock for $2.51 per share.  On October 19, 2012, Defendant Underdown sold 843 shares of Company stock for $2.47 per share.  On November 5, 2012, Defendant Underdown sold 19,160 shares of Company stock for $2.27 per share.  On November 6, 2012, Defendant Underdown sold 25,000 shares of Company stock for $2.34 per share.  On November 7, 2012, Defendant Underdown sold 29,997 shares of Company stock for $2.40 per share.  On April 16, 2014, Defendant Underdown purchased 5,000 shares of Company stock for $1.05 per share.  On April 30, 2015, Defendant Underdown purchased 4,000 shares of Company stock for $2.20 per share.  Thus, in total, Defendant Underdown made net sales before the fraud was exposed for a total of 70,234 shares of Company stock from which he received net proceeds (less payment for 9,000 shares he purchased) in the amount of $172,707.

59.     His insider sales made with knowledge of material non-public information before the fraud was exposed demonstrates his motive in facilitating and participating in the fraud.

60.     Upon information and belief, Defendant Underdown is a citizen of Texas.

**Defendant Yancey**

61.     Defendant Clyde Layton Yancey ("Yancey") has served as the Company's Vice President of Exploration.  According to a Form 4 filed with the SEC on January 5, 2015, as of January 2, 2015, Defendant Yancey beneficially owned 270 thousand shares of the Company's common stock.

62.     According to the Company's website:

Mr. Yancey is responsible for all of the Company's exploration projects, including those in South Texas and other states.  With the commencement of production, and with development occupying a good portion of the Company's efforts, he will ensure that the Company's exploration projects remain a priority and advance at a rapid pace.

Mr. Yancey received his BSc in Geology from  Trinity  University, San Antonio, Texas in 1975, and his MSc in Geology from the South Dakota School of Mines and Technology in 1978. Mr. Yancey began his professional career with the USGS, Uranium and Thorium Resources Branch, in 1978.  He continued working in uranium development through 1989 while employed in exploration and in-situ mining production for Wyoming Minerals Corporation, Caithness Mining Corporation, Mobil Oil, and Moore Energy. From 1989 to 2005, Mr. Yancey concentrated on reclamation investigations at various uranium mill tailings sites throughout the southwest  United States  for mining companies, government agencies and First Nations. He has served as a member of the UEC team since January 2006, and is currently a Registered Professional Geologist in Wyoming and Texas.

63.     On February 6, 2012, Defendant Yancey sold 30,000 shares of Company stock for $4.00 per share.  On December 23, 2014, Defendant Yancey sold 12,000 shares of Company stock for $1.67 per share.  On December 24, 2014, Defendant Yancey sold 13,000 shares of Company stock for $1.68 per share.  Defendant Yancey made no purchases of Company stock before the fraud was exposed on June 18, 2015.  Thus, in total, Defendant Yancey made net sales

before the fraud was exposed for a total of 55,000 shares of Company stock from which he received net proceeds in the amount of $161,916.

64.     His insider sales made with knowledge of material non-public information before the fraud was exposed demonstrates his motive in facilitating and participating in the fraud.

65.     Upon information and belief, Defendant Yancey is a citizen of Florida.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

66.     By reason of their positions as officers, directors and/or fiduciaries of Uranium Energy and because of their ability to control the business and corporate affairs of Uranium Energy, the Individual Defendants owed Uranium Energy and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Uranium Energy in a fair, just, honest, and equitable manner.   The Individual Defendants were and are required to act in furtherance of the best interests of Uranium Energy and its shareholders so as to benefit all shareholders equally.

67.     Each director and officer of the Company owes to Uranium Energy and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

68.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Uranium Energy, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

- 20 -

69.   To discharge their duties, the officers and directors of Uranium Energy were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

70.   Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Uranium Energy, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Uranium Energy's Board at all relevant times.

71.   As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Securities Exchange Act of 1934 ("Exchange Act") and traded on the NYSE, the Individual Defendants had a duty not to effect and to prevent the corrupt Stock Promoters from effecting the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the omission of the fact that the Stock Promoters were paid by the Company, and had a duty to cause the Company to disclose in its regulatory

filings with the SEC that the Company paid the Stock Promoters, so that the market price of the Company's common stock would be based upon truthful and accurate information.

72.    To discharge their duties, the officers and directors of Uranium Energy were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Uranium Energy were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Nevada, the United States, and pursuant to the Uranium Energy's own Code of Business Conduct and Ethics Policy and internal guidelines;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Uranium Energy conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Uranium Energy and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Uranium Energy's operations would comply with all laws and Uranium Energy's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

(i)      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock.

73.      Each of the Individual Defendants further owed to Uranium Energy and the shareholders the duty of loyalty requiring that each favor Uranium Energy's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

74.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Uranium Energy and were at all times acting within the course and scope of such agency.

75.     Because of their advisory, executive, managerial, and directorial positions with Uranium Energy, each of the Individual Defendants had access to adverse, non-public information about the Company.

76.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Uranium Energy and the Stock Promoters.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

77.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

78.     The purpose and effect of the conspiracy, common enterprise and/or common course of conduct was, among other things, to: (i) engage in, facilitate, and conceal the scheme to A) manipulate the price and trading volume of Uranium Energy's stock by using the Stock Promoters, which in some cases failed to disclose to potential investors that they had been paid by the Company to promote the purchase of the stock, B) fail to disclose that the Company paid the Stock Promoters in Uranium Energy's regulatory filings pursuant to Section 17(b) of the Securities Act of 1933, and C) engage in lucrative insider sales of Company stock; (ii) facilitate

and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; (iii) fail to maintain adequate internal and financial controls; and (iv) fail to disclose that Uranium Energy failed to maintain adequate internal and financial controls.

79.     The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by, among other things, causing the Company to purposefully, recklessly or negligently fail to maintain effective accounting and internal control policies and procedures.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

80.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

81.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Uranium Energy, and was at all times acting within the course and scope of such agency.

## CODE OF ETHICS

82.     Pursuant to the Company's Code of Business Conduct and Ethics Policy (the "Code of Ethics"), the conduct of all of the Company's officers, directors, and employees is governed by the Code of Ethics.

- 25 -

83.     The Code of Ethics provides, as to "Criteria for Ethical Decision Making," that:

Before embarking on any course of action, you need to ask yourself these questions:

•       Is the life, health or safety of anyone, or the environment endangered by the action?

•       Is it legal?

•       Does it feel fair and honest?

•       Does it compromise trust or integrity?

•       Could I justify it to the public?

You are required to promptly discuss any questions or concerns you may have about this Code or the correctness of any past, present or anticipated conduct with a member of the executive team or a Human Resources Manager.

84.     The Code of Ethics provides, as to "Ethical Business Practices of Conflicts of Interest," that:

Each employee is to be accountable to adhere to and advocate high standards of honest and ethical conduct as outlined in this Code.

85.     The Code of Ethics provides, as to "Fair Dealings," that:

Deal fairly and honestly with the Company's collaborators, suppliers, competitors, other employees, and anyone else with whom you have contact in the course of performing your job. You should not take unfair advantage of anyone through manipulation, concealment, misappropriate or abuse of confidential information, falsification, misrepresentation of material facts or any other unfair dealing practice.

The Company requires that all contracts, agreements and other documents correctly set forth the terms of the underlying business arrangement and that any such documents are reviewed and approved through established Company policy and procedures.

86.     The Code of Ethics provides, as to "Corporate Opportunities and Duty of Loyalty," that:

You have a duty of loyalty to the Company, which includes a duty to advance the Company's legitimate interests when the opportunity to do so arises. Accordingly, you

- 26 -

may not use your position or the Company's name, property, information or good will for personal gain or for the gain of others. You are further prohibited from taking advantage of a personal opportunity that is discovered through the use of corporate property, information or your position with the Company.

87.     The Code of Ethics provides, as to "Conflicts of Interest," that:

A conflict of interest arises when your private interests interfere, or appear to interfere, in any way, with the interest of the Company as a whole. You are to take care to ensure that you identify and avoid any situation of actual or apparent conflict of interest.

Some conflicts are clear-cut; others are less obvious. For that reason, you must fully disclose to a member of the executive team all circumstances that could be construed or perceived as a conflict of interest. Full disclosure enables us to resolve unclear situations and create an opportunity to dispose of or ethically handle conflicts of interest before any difficulty can arise. To the extent a conflict of interest cannot be avoided in a reasonable fashion then appropriate procedures must be put in place to minimize the involvement of any conflicted individuals in the relationship or interaction, giving rise to the conflict. Failure to make required disclosures or resolve conflicts of interest satisfactorily can result in discipline up to and including termination of employment.

Any employment agreement with the Company may appropriately prohibit an employee's employment or engagement in any capacity in any other business without the prior permission of the Company. This provision broadly addresses potential conflicts of interest. Specific examples include, but are not limited to:

•       Acting as an employee, director or officer of or a consultant to, a competitor or potential competitor of the Company, regardless of the nature of the employment or consulting relationship;

•       Holding a substantial interest in a business which is a customer, competitor or supplier of the Company or which otherwise does business with the Company;

•       The purchase of merchandise or services for the Company from, or placement of other business with, a company directly or beneficially owned or controlled by an employee, director or officer of the Company, his or her spouse, relative, in-law or co-habitant;

•       Serving as proprietor, general partner, officer or director of any business (except charitable organizations or family businesses that in no way compete with the Company or do business with the Company) without first obtaining written consent of the CEO of the Company. (Non-employee directors of the Company are excluded from this prohibition.).

88.    The Code of Ethics provides, as to "Compliance with Laws, Regulations and

Rules," that:

You will at all times obey and comply with all federal, provincial, state and local laws, regulations and ordinances of the countries in which we operate, including but not limited to:

• Health and safety laws concerning the workplace;

• Civil rights laws concerning harassment and job discrimination;

• Employment laws concerning payment of minimum wage, overtime requirements, child labor and general working conditions;

• Immigration related laws concerning the hiring of legally documented workers

• Laws concerning racketeering and corrupt practices

• Laws concerning the proper maintenance of books, records and internal controls

• Laws, regulations, and accepted industry practices concerning drug development and commercialization

• Laws prohibiting illegal payments, gifts, bribes or kickbacks to governmental officials, political parties or others

• Privacy laws

• Environmental laws

• Laws prohibiting misappropriation, unauthorized use, reproduction or distribution of any third party's trade secrets, copyrighted information or confidential proprietary information

• Antitrust and other laws prohibiting unfair competition or restraint of trade

• Any other applicable law or regulation ordinance

You will not commit or condone an unethical or illegal act nor instruct another employee, consultant, contractor, supplier or representative of the Company to do so. You will not authorize or permit any consultant, contractor, distributor or representative of the Company to have authority to enter into, incur, make, change, enlarge or modify any contract, liability or agreement, obligation, representations, guarantee, warranty or

- 28 -

commitment on behalf of the Company or its affiliated companies unless expressly approved by duly authorized representatives of the Company in the performance of the services contemplated under their respective agreement.

You are expected to be sufficiently familiar with any laws that apply to our work, to recognize potential breaches and to know when to seek legal advice. If in doubt, you should discuss the matter with a member of the executive team.

89.     The Code of Ethics provides, as to "Insider Information and Tipping," that:

Securities laws prohibit the buying and selling of any securities, including Company securities, as well as securities of partners, contractors, suppliers and all other corporations, by anyone who possesses material, non-public information relating to the issuer of the securities. Material non-public information is information which, if disclosed, would reasonably be expected to have a significant impact on the market value of such securities or which would be likely to influence an investor's decision to purchase or sell a security.

From time to time the Company implements stock trading blackout periods during which time directors, officers and employees are restricted from buying or selling shares. Background information on blackouts is made available to employees on the Company's internet site.

Also prohibited is "tipping" – the disclosure of material, non-public information to anyone other than in the necessary course of business. "Tipping" is a violation of the law and may result in civil or criminal liability of the person who passes material non-public information to another person who buys or sells securities while in possession of the information.

The Company does not condone, nor assist others in conducting activities which contravene the securities laws.

90.     The Code of Ethics provides, as to "Accounting and Recordkeeping," that:

Many people associated with the Company, not just accountants and controllers, participate in the financial control and reporting processes of the Company. If you have ANY responsibility for any aspect of the Company's financial activities (including, but not limited to, processing of cash receipts or processing or approval of payments; creation, processing or approval of invoices and credit memos; payroll and benefits decisions; approval of expense reports and any and all other transactions; or the estimation of reserves or other claims or the amount of any accrual of deferral; or the recording of any of the foregoing in the Company's ledgers) and/or the preparation of the Company's financial statements or other reports, you must ensure your involvement complies with complete and accurate procedures as per established Company practice.

You shall not subvert the Company's established systems of internal management and accounting controls, maintain funds or assets for any illegal or improper purposes or make false or misleading statements in any Company documents, reports or records. No undisclosed or unrecorded accounts may be established using the Company's funds or other assets. All accounting records and the financial reports produced from those records must be kept and presented in accordance with applicable law, must accurately and fairly reflect in reasonable detail the Company's assets, liabilities, revenue and expenses, and must be in accordance with generally accepted accounting principles.

Transactions must be supported by accurate and reasonably detailed documentation and recorded in the proper account. Best efforts are to be made to record transactions in the proper accounting time period. To the extent that estimates are necessary, they must be based on your good faith judgment and be supported by appropriate documentation. No payment or the related accounting entry may be approved or made with the intention or understanding that any part of the payment will be used for any purpose other than that described by the document supporting the entry or payment.

If you receive inquiries from the Company's independent accountants, you must respond promptly, fully and accurately.

91.     The Code of Ethics provides, as to "Reporting and Compliance Procedures," that:

Every employee, officer and director has the responsibility to ask questions, seek guidance, report suspected violation and express concern regarding compliance with this Code, including but not limited to questionable accounting, internal accounting control or auditing matters.

Any employee, officer or director who knows or believes that any other employee or representative of the Company has engaged or is engaging in Company-related conduct that violates applicable law or this Code has the responsibility to report such information. You should first talk to any member of the executive team or a Human Resources manager.

If you are not comfortable reporting to the above, it is not feasible, or such reporting has resulted in unsatisfactory results, you are to report such suspected violations to an independent member of the Board's Audit Committee as set out below.

Failure to comply with the standards outlined in this Code will result in disciplinary action including, but not limited to, reprimands, warnings, probation or suspension without pay, demotions, reductions in salary, discharge and restitution. Certain violations of this Code may require the Company to refer the matter to the appropriate governmental or regulatory authorities for investigation or persecution. Moreover, any supervisor who directs or approves of any conduct in violation of this Code, or who has

knowledge of such conduct and does not immediately report it, also will be subject to disciplinary action, up to and including discharge.

92.     In violation of the Code of Ethics, the Individual Defendants (as key officers and as members of the Company's Board) conducted little, if any, oversight of the Company's internal controls over public reporting of the Individual Defendants' scheme to manipulate the price and trading volume of Uranium Energy's stock by the use of the Stock Promoters who failed to disclose to potential investors that they had been paid by the Company to promote the purchase of the stock, by the Company's failing to disclose that it paid the Stock Promoters in Uranium Energy's regulatory filings pursuant to Section 17(b) of the Securities Act of 1933, and by Individual Defendants' engaging in lucrative insider sales, scheme to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, insider sales, and unjust enrichment, and scheme to conceal the Company's failure to maintain adequate internal and financial controls.  In violation of the Code of Ethics, the Individual Defendants consciously disregarded their duties to comply with the applicable laws and regulations, protect corporate assets, engage in fair dealing, avoid using corporate opportunities for personal gain, avoid conflicts of interest, avoid insider trading, appropriately maintain the Company's books, records, accounts, and financial statements, and make accurate filings with the SEC.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

93.     Under the direction and control of the Individual Defendants, the corrupt Stock Promoters touted Uranium Energy stock without, in many cases, disclosing that they were paid to do so by the Company, and in all such cases the Company failed to disclose in its regulatory filings with the SEC that it paid the Stock Promoters for promoting the Company's stock.

94.     The purpose of this promotional campaign was to raise additional capital, increase shareholder value, and raise visibility to the public capital market.

95.     The Stock Promoters conducted a massive promotional campaign, which included sending emails to mailing lists and publishing news reports and making various statements through various social media outlets and websites.

96.     Below are 43 *examples* of such fraudulent conduct involving the Company and the Stock Promoters.

97.     On June 20, 2011 a company named Evergreen Marketing, Inc. sent an email touting Uranium Energy to a mailing list of a vast array of U.S. investors and published the information in the email on its website, but failed to disclose that it received $4,500 directly or indirectly from Uranium Energy for doing so.  Additionally, Uranium Energy failed to disclose that it paid Evergreen Marketing, Inc. $4,500 for the stock promotion in the Company's regulatory filings with the SEC.

98.     On June 21, 2011, a company named Hyper Growth Stock owned by IAB Media Inc. sent an email touting Uranium Energy to a mailing list of a vast array of U.S. investors and published the information in the email on its website.  In the email, Hyper Growth Stock stated that Lake Group Media paid it $7,500 for the stock promotion, but failed to disclose that it received the $7,500 indirectly from Uranium Energy or that Uranium Energy paid Lake Group Media to hire Hyper Growth Stock.  Additionally, Uranium Energy failed to disclose that it paid Hyper Growth Stock or Lake Media Group $7,500 for the stock promotion in the Company's regulatory filings with the SEC.

99.     On the same day, a company named PennyStockRyder, which was also owned by IAB Media Inc., sent an email touting Uranium Energy to a mailing list of a vast array of U.S. investors and published the information in the email on its website.   In the email, PennyStockRyder stated that Lake Group Media paid it $7,500 for the stock promotion, but failed to disclose that it received the $7,500 indirectly from Uranium Energy or that Uranium Energy paid Lake Group Media to hire PennyStockRyder.   Additionally, Uranium Energy failed to disclose that it paid PennyStockRyder or Lake Media Group $7,500 for the stock promotion in the Company's regulatory filings with the SEC.

100.     On June 22, 2011, Hyper Growth Stock (owned by IAB Media Inc.) sent an email touting Uranium Energy to a mailing list of a vast array of U.S. investors and published the information in the email on its website.   In the email, Hyper Growth Stock stated that Lake Group Media paid it $7,500 for the stock promotion, but failed to disclose that it received the $7,500 indirectly from Uranium Energy or that Uranium Energy paid Lake Group Media to hire Hyper Growth Stock.   Additionally, Uranium Energy failed to disclose that it paid Hyper Growth Stock or Lake Media Group $7,500 for the stock promotion in the Company's regulatory filings with the SEC.

101.     On the same day, PennyStockRyder (owned by IAB Media Inc.) sent an email touting Uranium Energy a mailing list of a vast array of U.S. investors and published the information in the email on its website.   In the email, PennyStockRyder stated that Lake Group Media paid it $7,500 for the stock promotion, but failed to disclose that it received the $7,500 indirectly from Uranium Energy or that Uranium Energy paid Lake Group Media to hire PennyStockRyder.   Additionally, Uranium Energy failed to disclose that it paid

PennyStockRyder or Lake Media Group $7,500 for the stock promotion in the Company's regulatory filings with the SEC.

102.    On the same day, PennyStockRyder (owned by IAB Media Inc.) sent a second email touting Uranium Energy to a mailing list of a vast array of U.S. investors and published the information in the email on its website.  In the email, PennyStockRyder stated that Lake Group Media paid it $7,500 for the stock promotion, but failed to disclose that it received the $7,500 indirectly from Uranium Energy or that Uranium Energy paid Lake Group Media to hire PennyStockRyder.    Additionally,  Uranium  Energy  failed  to  disclose  that  it  paid PennyStockRyder or Lake Media Group $7,500 for the stock promotion in the Company's regulatory filings with the SEC.

103.    On the same day, a company named SuperBirdStocks.com, which was owned by GVI Ltd., sent an email touting Uranium Energy to a mailing list of a vast array of U.S. investors and published the information in the email on its website.  In the email, SuperBirdStocks.com stated that it was paid for the stock promotion, but failed to disclose how much it was paid or that it was paid indirectly or directly by Uranium Energy.  Additionally, Uranium Energy failed to disclose that it paid SuperBirdStocks.com for the stock promotion in the Company's regulatory filings with the SEC.

104.    On June 23, 2011, SuperBirdStocks.com (owned by GVI Ltd.) sent an email touting Uranium Energy to a mailing list of a vast array of U.S. investors and published the information in the email on its website.  In the email, SuperBirdStocks.com stated that it was paid for the stock promotion, but failed to disclose how much it was paid or that it was paid indirectly or directly by Uranium Energy.  Additionally, Uranium Energy failed to disclose that it

paid SuperBirdStocks.com for the stock promotion in the Company's regulatory filings with the SEC.

105.    On the same day, a company named BeaconEquity.com owned by BlueWave Advisors sent an email touting Uranium Energy to a mailing list of a vast array of U.S. investors and published the information in the email on its website.  In the email, BeaconEquity.com stated that Mission IR paid it $30,000 for the stock promotion, but failed to disclose that it received the $30,000 indirectly from Uranium Energy or that Uranium Energy paid Mission IR to hire BeaconEquity.com.    Additionally,  Uranium  Energy  failed  to  disclose  that  it  paid BeaconEquity.com or Mission IR $30,000 for the stock promotion in the Company's regulatory filings with the SEC.

106.    On the same day, BeaconEquity.com (owned by BlueWave Advisors) sent a second email touting Uranium Energy to a mailing list of a vast array of U.S. investors and published the information in the email on its website.  In the email, BeaconEquity.com failed to state that it was paid any money for the stock promotion, and failed to state that it was paid for the stock promotion by Mission IR or that it was compensated indirectly by Uranium Energy or that Uranium Energy paid Mission IR to hire BeaconEquity.com.    Additionally, Uranium Energy failed to disclose that it paid BeaconEquity.com or Mission IR for the stock promotion in the Company's regulatory filings with the SEC.

107.    On the same day, a company named StockPreacher.com, which was also owned by BlueWave Advisors, sent an email touting Uranium Energy to a mailing list of a vast array of U.S. investors and published the information in the email on its website.   In the email, StockPreacher.com stated that Mission IR paid it $30,000 for the stock promotion, but failed to

disclose that it received the $30,000 indirectly from Uranium Energy or that Uranium Energy paid Mission IR to hire StockPreacher.com.  Additionally, Uranium Energy failed to disclose that it paid StockPreacher.com or Mission IR $30,000 for the stock promotion in the Company's regulatory filings with the SEC.

108.   On the same day, StockPreacher.com (owned by BlueWave Advisors) sent a second email touting Uranium Energy to a mailing list of a vast array of U.S. investors and published the information in the email on its website.  In the email, StockPreacher.com stated that Mission IR paid it $30,000 for the stock promotion, but failed to disclose that it received the $30,000 indirectly from Uranium Energy or that Uranium Energy paid Mission IR to hire StockPreacher.com.   Additionally, Uranium Energy failed to disclose that it paid StockPreacher.com or Mission IR $30,000 for the stock promotion in the Company's regulatory filings with the SEC.

109.   On April 15, 2015, an article published on SeekingAlpha.com exposed MissionIR's illegal stock promotion of other companies as follows:

> In the past, ForceField was a Dream Team client. The Dream Team was a firm that got paid to write undisclosed paid articles, which were edited and approved by management teams of their clients. The retail targeted articles were designed to prop up the share price and volume so that companies could issue stock to raise money. The scam worked exceptionally well.
>
> *        *        *
>
> Back in 2014, I wrote a detailed article about stock promotion firm "The Dream Team Group" which was hiring out writers to conduct undisclosed paid promotions on small cap companies. The writers would pretend to be well qualified industry experts putting forth a professional analysis (and a strong buy) on a stock. In fact, they were simply hired gun writers with no credentials whatsoever. Yet their professional writings invariably caused their target stocks to soar. The authors managed to infiltrate a wide variety of locations, including Forbes.com, TheStreet.com, Seeking Alpha and the Wall Street Cheat Sheet.

To gain information, I posed as a paid stock promoter looking to write undisclosed paid articles. The chief writer for the Dream Team (Tom Meyer) then began giving me assignments.

The main stocks I wrote about in this promotion scandal were Galena Biopharma (NYSE:GALE) and CytRx (NYSE:CYTR), both of which ended up plunging by as much as 50-80% when the promotions unraveled. CytRx has rebounded some, while Galena has continued to plunge.

But there were other companies which I did not give as much attention to because they were too small or illiquid to matter at the time. (Although I did not write about many of these stocks, I did notify all of the various websites such as Seeking Alpha, TheStreet.com and Wall Street Cheat Sheet so that they could remove any articles and ban any violating authors).

ForceField is one such stock. At the time, it was one of a number of beaten down illiquid stocks which didn't seem to be catching the promotional wave. But now it appears that the continued promotional efforts have resulted in the stock hitting all-time highs on much greater volume. This is all occurring just as the company needs to raise money.

ForceField was a paid Dream Team promotion which was written about by both Tom Meyer (multiple aliases including Wonderful Wizard and others) and John Mylant. These were the two main Dream Team writers. Their articles have since been removed from Seeking Alpha, but the original references can still be found in various places. In addition, ForceField is listed here among the other Dream Team clients on the Investors Hub page for Mission IR. Mission IR was the Dream Team subsidiary responsible for handling the paid articles.

\*       \*       \*

**It should be kept in mind that the standard process for these writers was to submit their drafts to management at the target company for review before publishing. In other words, management of these companies knew and encouraged the illegal stock promotion as a way of getting their share prices up.**

(Emphasis in original).

110.    Articles by the Dream Team's primary paid authors Tom Meyer and John Mylant caused a steep run-up in the stock price of the companies about which they published articles as did the articles created by MissionIR. Not only did they publish articles under their names, but they used pseudonyms.  For example, Tom Meyer wrote under the name Wonderful Wizard.

- 37 -

111.    On March 20, 2014, *Fortune.com* published the article, "At financial news sites, stock promoters make inroads."  The article discussed the role of stock promoters, specifically the Dream Team, and how stock promoter's must reveal compensation for these types of articles. The article stated in relevant part:

> For example, Seeking Alpha has an article by Mylant, touting ForceField Energy (FNRG -1.82% ). Mylant's disclosure in the article says he did not receive any compensation to write the piece. Yet ForceField is listed as a client on DreamTeam's website. Seeking Alpha, which is in the process of reviewing and removing other articles, says it has evidence that Mylant was paid by some of his subjects to write articles about them. Mylant could not be reached for comment. ForceFIeld Energy did not return a call for comment.

112.    On March 25, 2012, a company named Shazamstocks.com, which stated that it was a consultant to Future Money Trends, sent an email touting Uranium Energy to a mailing list of a vast array of U.S. investors and published the information in the email on its website.  In the email, Shazamstocks.com stated that Lake Group Media, Inc. paid it $50,000 for the stock promotion, and stated that Uranium Energy published it.  Lake Group Media is the same company that, as alleged above, Hyper Growth Stock and PennyStockRyder stated paid them $7,500 for their Uranium Energy stock promotions without disclosing that Uranium Energy paid them or paid Lake Group Media.  Shazamstocks.com failed to disclose that it received the $50,000 indirectly from Uranium Energy or that Uranium Energy paid Lake Group Media, Inc. to hire Shazamstocks.com.   Additionally, Uranium Energy failed to disclose that it paid Shazamstocks.com or Lake Media Group, Inc. $50,000 for the stock promotion in the Company's regulatory filings with the SEC.

113.    On March 26, 2012, Shazamstocks.com (a consultant to Future Money Trends) sent an email touting Uranium Energy to a mailing list of a vast array of U.S. investors and

published the information in the email on its website.  In the email, Shazamstocks.com stated that Lake Group Media, Inc. paid it $50,000 for the stock promotion, and stated that Uranium Energy published it.  Lake Group Media is the same company that, as alleged above, Hyper Growth Stock and PennyStockRyder stated paid them $7,500 for their Uranium Energy stock promotions without disclosing that Uranium Energy paid them or paid Lake Group Media. Shazamstocks.com failed to disclose that it received the $50,000 indirectly from Uranium Energy or that Uranium Energy paid Lake Group Media, Inc. to hire Shazamstocks.com. Additionally, Uranium Energy failed to disclose that it paid Shazamstocks.com or Lake Media Group, Inc. $50,000 for the stock promotion in the Company's regulatory filings with the SEC.

114.    On the same day, Shazamstocks.com (a consultant to Future Money Trends) sent a second email touting Uranium Energy to a mailing list of a vast array of U.S. investors and published the information in the email on its website.  In the email, Shazamstocks.com stated that Lake Group Media, Inc. paid it $50,000 for the stock promotion, and stated that Uranium Energy published it.  Lake Group Media is the same company that, as alleged above, Hyper Growth Stock and PennyStockRyder stated paid them $7,500 for their Uranium Energy stock promotions without disclosing that Uranium Energy paid them or paid Lake Group Media. Shazamstocks.com failed to disclose that it received the $50,000 indirectly from Uranium Energy or that Uranium Energy paid Lake Group Media, Inc. to hire Shazamstocks.com. Additionally, Uranium Energy failed to disclose that it paid Shazamstocks.com or Lake Media Group, Inc. $50,000 for the stock promotion in the Company's regulatory filings with the SEC.

115.    On March 27, 2012, Shazamstocks.com (a consultant to Future Money Trends) sent an email touting Uranium Energy to a mailing list of a vast array of U.S. investors and

published the information in the email on its website.  In the email, Shazamstocks.com stated that Lake Group Media, Inc. paid it $50,000 for the stock promotion, and stated that Uranium Energy published it.  Lake Group Media is the same company that, as alleged above, Hyper Growth Stock and PennyStockRyder stated paid them $7,500 for their Uranium Energy stock promotions without disclosing that Uranium Energy paid them or paid Lake Group Media. Shazamstocks.com failed to disclose that it received the $50,000 indirectly from Uranium Energy or that Uranium Energy paid Lake Group Media, Inc. to hire Shazamstocks.com. Additionally, Uranium Energy failed to disclose that it paid Shazamstocks.com or Lake Media Group, Inc. $50,000 for the stock promotion in the Company's regulatory filings with the SEC.

116.    On March 28, 2012, a company named Researchdriveinvestor.com, which stated that it was owned by Research Driven Investor, LLC, sent an email touting Uranium Energy to a mailing list of a vast array of U.S. investors and published the information in the email on its website.  In the email, Researchdriveinvestor.com stated that Lake Group Media, Inc. paid it $40,000 for the stock promotion.  Lake Group Media is the same company that, as alleged above, Hyper Growth Stock, PennyStockRyder, and Shazamstocks.com stated paid them for their Uranium Energy stock promotions without disclosing that Uranium Energy paid them or paid Lake Group Media.  Researchdriveinvestor.com failed to disclose that it received the $40,000 indirectly from Uranium Energy or that Uranium Energy paid Lake Group Media, Inc. to hire Researchdriveinvestor.com.  Additionally, Uranium Energy failed to disclose that it paid Researchdriveinvestor.com or Lake Media Group, Inc. $40,000 for the stock promotion in the Company's regulatory filings with the SEC.

117.    On the same day, a company named Stockdigestreport.com, which stated that it was owned by Solomon Small Cap Group LLC, sent an email touting Uranium Energy to a mailing list of a vast array of U.S. investors and published the information in the email on its website.  In the email, Stockdigestreport.com stated that Lake Group Media, Inc. paid it $40,000 for the stock promotion.  Lake Group Media is the same company that, as alleged above, Hyper Growth Stock, PennyStockRyder, Shazamstocks.com, and Researchdriveinvestor.com  stated paid them for their Uranium Energy stock promotions without disclosing that Uranium Energy paid them or paid Lake Group Media.  Stockdigestreport.com failed to disclose that it received the $40,000 indirectly from Uranium Energy or that Uranium Energy paid Lake Group Media, Inc. to hire Stockdigestreport.com.  Additionally, Uranium Energy failed to disclose that it paid Stockdigestreport.com or Lake Media Group, Inc. $40,000 for the stock promotion in the Company's regulatory filings with the SEC.

118.    On March 29, 2012, Stockdigestreport.com (owned by Solomon Small Cap Group LLC) sent an email touting Uranium Energy to a mailing list of a vast array of U.S. investors and published the information in the email on its website.  In the email, Stockdigestreport.com stated that Lake Group Media, Inc. paid it $40,000 for the stock promotion.  Lake Group Media is the same company that, as alleged above, Hyper Growth Stock, PennyStockRyder, Shazamstocks.com, and Researchdriveinvestor.com stated paid them for their Uranium Energy stock promotions without disclosing that Uranium Energy paid them or paid Lake Group Media. Stockdigestreport.com failed to disclose that it received the $40,000 indirectly from Uranium Energy or that Uranium Energy paid Lake Group Media, Inc. to hire Stockdigestreport.com. Additionally, Uranium Energy failed to disclose that it paid Stockdigestreport.com or Lake

Media Group, Inc. $40,000 for the stock promotion in the Company's regulatory filings with the SEC.

119.    On January 31, 2013, Shazamstocks.com sent an email touting Uranium Energy to a mailing list of a vast array of U.S. investors and published the information in the email on its website.  In the email, Shazamstocks.com stated that Lake Group Media, Inc. paid it $35,000 for the stock promotion, and stated that Uranium Energy paid Lake Group Media. Shazamstocks.com failed to disclose that it was a consultant to Future Money Trends.  Lake Group Media is the same company that, as alleged above, Hyper Growth Stock, PennyStockRyder, Shazamstocks.com, and Researchdriveinvestor.com stated paid them for their Uranium Energy stock promotions without disclosing that Uranium Energy paid them or paid Lake Group Media.  Uranium Energy failed to disclose that it paid Shazamstocks.com or Lake Media Group, Inc. $35,000 for the stock promotion in the Company's regulatory filings with the SEC.

120.    On June 7, 2013, a company named TooNiceStocks.com sent an email touting Uranium Energy to a mailing list of a vast array of U.S. investors and published the information in the email on its website.  In the email, TooNiceStocks.com stated that Fin Media Networks paid it $60,000 for the stock promotion.  TooNiceStocks.com failed to disclose that it received the $60,000 indirectly from Uranium Energy or that Uranium Energy paid Fin Media Networks to hire TooNiceStocks.com.   Additionally, Uranium Energy failed to disclose that it paid TooNiceStocks.com or Fin Media Networks $60,000 for the stock promotion in the Company's regulatory filings with the SEC.

121.    On June 20, 2013, TooNiceStocks.com sent an email touting Uranium Energy to a mailing list of a vast array of U.S. investors and published the information in the email on its website.  In the email, TooNiceStocks.com stated that Fin Media Networks paid it $60,000 for the stock promotion.  TooNiceStocks.com failed to disclose that it received the $60,000 indirectly from Uranium Energy or that Uranium Energy paid Fin Media Networks to hire TooNiceStocks.com.    Additionally,  Uranium  Energy  failed  to  disclose  that  it  paid TooNiceStocks.com or Fin Media Networks $60,000 for the stock promotion in the Company's regulatory filings with the SEC.

122.    On June 25, 2013, TooNiceStocks.com sent an email touting Uranium Energy to a mailing list of a vast array of U.S. investors and published the information in the email on its website.  In the email, TooNiceStocks.com stated that Fin Media Networks paid it $60,000 for the stock promotion.  TooNiceStocks.com failed to disclose that it received the $60,000 indirectly from Uranium Energy or that Uranium Energy paid Fin Media Networks to hire TooNiceStocks.com.    Additionally,  Uranium  Energy  failed  to  disclose  that  it  paid TooNiceStocks.com or Fin Media Networks $60,000 for the stock promotion in the Company's regulatory filings with the SEC.

123.    On February 2, 2014, a company named Future Money Trends sent an email touting Uranium Energy to a mailing list of a vast array of U.S. investors and published the information in the email on its website.  Future Money Trends is the same company to which Shazamstocks.com stated it was a consultant.  In the email, Future Money Trends stated that Uranium Energy paid it $87,000 for the stock promotion.  Future Money Trends also stated that it owned 20,000 shares of Company stock.  In actuality Uranium Energy paid Future Money

Trends $87,000 *and* 20,000 shares of Company stock for the stock promotion.  Additionally, Uranium Energy failed to disclose that it paid Future Money Trends $87,000 and 20,000 shares of Company stock for the stock promotion in the Company's regulatory filings with the SEC.

124.   On February 3, 2014, Future Money Trends sent an email touting Uranium Energy to a mailing list of a vast array of U.S. investors and published the information in the email on its website.  Future Money Trends is the same company to which Shazamstocks.com stated it was a consultant.  In the email, Future Money Trends stated that Uranium Energy paid it $87,000 for the stock promotion.  Future Money Trends also stated that it owned 20,000 shares of Company stock.  In actuality Uranium Energy paid Future Money Trends $87,000 *and* 20,000 shares of Company stock for the stock promotion.  Additionally, Uranium Energy failed to disclose that it paid Future Money Trends $87,000 and 20,000 shares of Company stock for the stock promotion in the Company's regulatory filings with the SEC.

125.   On the same day, Future Money Trends sent a second email touting Uranium Energy to a mailing list of a vast array of U.S. investors and published the information in the email on its website.  Future Money Trends is the same company to which Shazamstocks.com stated it was a consultant.  In the email, Future Money Trends stated that Uranium Energy paid it $87,000 for the stock promotion.  Future Money Trends also stated that it owned 20,000 shares of Company stock.  In actuality Uranium Energy paid Future Money Trends $87,000 and 20,000 shares of Company stock for the stock promotion.  Additionally, Uranium Energy failed to disclose that it paid Future Money Trends $87,000 and 20,000 shares of Company stock for the stock promotion in the Company's regulatory filings with the SEC.

126.    On May 18, 2014, a company named LuckyStockPicks.com, which stated that it was owned by Raven Consulting Corp., sent an email touting Uranium Energy to a mailing list of a vast array of U.S. investors and published the information in the email on its website.  In the email, LuckyStockPicks.com stated that Uranium Energy paid it $5,000 for the stock promotion. Uranium Energy failed to disclose that it paid LuckyStockPicks.com $5,000 for the stock promotion in the Company's regulatory filings with the SEC.

127.    On the same day, a company named StockProfessors.com, which stated that it was also owned by Raven Consulting Corp., sent an email touting Uranium Energy to a mailing list of a vast array of U.S. investors and published the information in the email on its website.  In the email, StockProfessors.com stated that Uranium Energy paid it $5,000 for the stock promotion.  Uranium Energy failed to disclose that it paid StockProfessors.com $5,000 for the stock promotion in the Company's regulatory filings with the SEC.

128.    On the same day, a company named USAMarketNews.com, which stated that it was also owned by Raven Consulting Corp., sent an email touting Uranium Energy to a mailing list of a vast array of U.S. investors and published the information in the email on its website.  In the email, USAMarketNews.com stated that Uranium Energy paid it $5,000 for the stock promotion.  Uranium Energy failed to disclose that it paid USAMarketNews.com $5,000 for the stock promotion in the Company's regulatory filings with the SEC.

129.    On May 19, 2014, StockProfessors.com (owned by Raven Consulting Corp.), sent an email touting Uranium Energy to a mailing list of a vast array of U.S. investors and published the information in the email on its website.  In the email, StockProfessors.com stated Uranium Energy paid it $5,000 for the stock promotion.  Uranium Energy failed to disclose that it paid

StockProfessors.com $5,000 for the stock promotion in the Company's regulatory filings with the SEC.

130.    On May 29, 2014, a company named PennyStockShark.com, which stated that it was also owned by Raven Consulting Corp., sent an email touting Uranium Energy to a mailing list of a vast array of U.S. investors and published the information in the email on its website.  In the email, PennyStockShark.com stated that Uranium Energy paid it $5,000 for the stock promotion.  Uranium Energy failed to disclose that it paid PennyStockShark.com $5,000 for the stock promotion in the Company's regulatory filings with the SEC.

131.    On May 30, 2014, LuckyStockPicks.com (owned by Raven Consulting Corp.) sent an email touting Uranium Energy to a mailing list of a vast array of U.S. investors and published the information in the email on its website.  In the email, LuckyStockPicks.com stated that Uranium Energy paid it $5,000 for the stock promotion.  Uranium Energy failed to disclose that it paid LuckyStockPicks.com $5,000 for the stock promotion in the Company's regulatory filings with the SEC.

132.    On July 18, 2014, Future Money Trends sent an email touting Uranium Energy to a mailing list of a vast array of U.S. investors and published the information in the email on its website.  Future Money Trends is the same company to which Shazamstocks.com stated it was a consultant.  In the email, Future Money Trends stated that Uranium Energy paid it $87,000 for the stock promotion.  Future Money Trends also stated that it owned 20,000 shares of Company stock.  In actuality Uranium Energy paid Future Money Trends $87,000 *and* 20,000 shares of Company stock for the stock promotion.  Additionally, Uranium Energy failed to disclose that it

paid Future Money Trends $87,000 and 20,000 shares of Company stock for the stock promotion in the Company's regulatory filings with the SEC.

133.    On July 25, 2014, Future Money Trends sent an email touting Uranium Energy to a mailing list of a vast array of U.S. investors and published the information in the email on its website.  Future Money Trends is the same company to which Shazamstocks.com stated it was a consultant.  In the email, Future Money Trends stated that Uranium Energy paid it $87,000 for the stock promotion.  Future Money Trends also stated that it owned 20,000 shares of Company stock.  In actuality Uranium Energy paid Future Money Trends $87,000 *and* 20,000 shares of Company stock for the stock promotion.  Additionally, Uranium Energy failed to disclose that it paid Future Money Trends $87,000 and 20,000 shares of Company stock for the stock promotion in the Company's regulatory filings with the SEC.

134.    On September 10, 2014, Future Money Trends sent an email touting Uranium Energy to a mailing list of a vast array of U.S. investors and published the information in the email on its website.  Future Money Trends is the same company to which Shazamstocks.com stated it was a consultant.  In the email, Future Money Trends stated that Uranium Energy paid it $87,000 for the stock promotion.  Future Money Trends also stated that it owned 20,000 shares of Company stock.  In actuality Uranium Energy paid Future Money Trends $87,000 *and* 20,000 shares of Company stock for the stock promotion.  Additionally, Uranium Energy failed to disclose that it paid Future Money Trends $87,000 and 20,000 shares of Company stock for the stock promotion in the Company's regulatory filings with the SEC.

135.    On September 21, 2014, Future Money Trends sent an email touting Uranium Energy to a mailing list of a vast array of U.S. investors and published the information in the

email on its website.  Future Money Trends is the same company to which Shazamstocks.com stated it was a consultant.  In *this* email, Future Money Trends stated that Uranium Energy paid it $87,000 *and* 20,000 shares of Company stock for the stock promotion.  In this email, Future Money Trends did not state that it currently owned 20,000 shares of Company stock, as it had stated in its emails dated July 18, 2014, July 25, 2014, and September 10, 2014.  Uranium Energy failed to disclose that it paid Future Money Trends $87,000 and 20,000 shares of Company stock for the stock promotion in the Company's regulatory filings with the SEC.

136.    On November 10, 2014, a company named InvestorSoup.com, owned by Action Media Holdings Corp., sent an email touting Uranium Energy to a mailing list of a vast array of U.S. investors and published the information in the email on its website.  In the email, InvestorSoup.com stated that Raven Consulting Corp. paid it $22,500 for the stock promotion. LuckyStockPicks.com, StockProfessors.com, USAMarketNews.com, and PennyStockShark.com each had stated that Raven Consulting Corp. owned them and that they were paid $5,000 by Uranium Energy for their stock promotions of the Company.  InvestorSoup.com failed to disclose that it received the $22,500 indirectly from Uranium Energy or that Uranium Energy paid Raven Consulting Corp. to hire InvestorSoup.com.  Additionally, Uranium Energy failed to disclose that it paid InvestorSoup.com or Raven Consulting Corp. $22,500 for the stock promotion in the Company's regulatory filings with the SEC.

137.    On the same day, LuckyStockPicks.com, which stated that it is owned by Red Rock Media, sent an email touting Uranium Energy to a mailing list of a vast array of U.S. investors and published the information in the email on its website.  In the email, LuckyStockPicks.com stated that Brazil Resources, Inc. paid it $5,000 for the stock promotion.

LuckyStockPicks.com, in two emails it sent six months earlier and in corresponding website publications, stated that Raven Consulting Corp., not Red Rock Media, owned it, and that it was paid $5,000 *by Uranium Energy* for its stock promotion of the Company.    But in LuckyStockPicks.com's November 10, 2014 email, it failed to disclose that it received the $5,000 indirectly from Uranium Energy or that Uranium Energy paid Brazil Resources, Inc. to hire LuckyStockPicks.com.   *Yet, 2015 Proxy Statement states that Defendant Adnani (Uranium Energy's Chairman, President, and CEO) is the founder and chairman of Brazil Resources, Inc., Defendant Kong (Uranium Energy's Director) is one of six directors at Brazil Resources, Inc., and Pat Obara (Uranium Energy's Vice President of Administration) is another director and the chief financial officer of Brazil Resources, Inc.!   Brazil Resources, Inc. is a company incorporated and domiciled in Canada.  Brazil Resources, Inc. reported a net loss of over 5 million Canadian dollars for the year ended November 30, 2014 in its financial statements dated March 30, 2015, according to which Brazil Resources, Inc. "is principally engaged in the acquisition, exploration and development of mineral properties in Brazil."  According to Brazil Resources, Inc.'s prospectus dated April 21, 2011, Defendant Adnani owned 16.11% of its stock, Defendant Kong owned 0.96% of its stock, and Pat Obara owned 2.25% of its stock. Brazil Resources, Inc. is NOT in the business of promoting other companies' stock.*  Uranium Energy failed to disclose that it paid LuckyStockPicks.com or Brazil Resources, Inc., a company affiliated with Uranium Energy, $5,000 for the stock promotion in the Company's regulatory filings with the SEC.

138.    On the same day, a company named MicroStockProfit.com, which stated that it is also owned by Action Media Holdings Corp., sent an email touting Uranium Energy to a mailing

list of a vast array of U.S. investors and published the information in the email on its website.  In the email, MicroStockProfit.com stated that Raven Consulting Corp. paid it $22,500 for the stock promotion.        LuckyStockPicks.com,    StockProfessors.com,    USAMarketNews.com,    and PennyStockShark.com each had stated that Raven Consulting Corp. owned them and that they were paid $5,000 *by Uranium Energy* for their stock promotions of the Company.   Yet, InvestorSoup.com stated that Raven Consulting Corp. paid it $22,500 for its stock promotion. MicroStockProfit.com failed to disclose that it received the $22,500 indirectly from Uranium Energy or that Uranium Energy paid Raven Consulting Corp. to hire MicroStockProfit.com. Additionally, Uranium Energy failed to disclose that it paid MicroStockProfit.com or Raven Consulting Corp. $22,500 for the stock promotion in the Company's regulatory filings with the SEC.

139.    On the same day, a company named PennyStocksFinder, which stated that it is also owned by Action Media Holdings Corp., sent an email touting Uranium Energy to a mailing list of a vast array of U.S. investors and published the information in the email on its website.  In the email, PennyStocksFinder stated that Raven Consulting Corp. paid it $22,500 for the stock promotion.        LuckyStockPicks.com,    StockProfessors.com,    USAMarketNews.com,    and PennyStockShark.com each had stated that Raven Consulting Corp. owned them and that they were paid $5,000 *by Uranium Energy* for their stock promotions of the Company.   Yet, InvestorSoup.com and MicroStockProfit.com each stated that Raven Consulting Corp. paid them $22,500 for their stock promotions. PennyStocksFinder failed to disclose that it received the $22,500 indirectly from Uranium Energy or that Uranium Energy paid Raven Consulting Corp. to hire PennyStocksFinder.   Additionally, Uranium Energy failed to disclose that it paid

PennyStocksFinder or Raven Consulting Corp. $22,500 for the stock promotion in the Company's regulatory filings with the SEC.

140.    On the same day, StockPreacher.com, which stated that it is also owned by Action Media Holdings Corp., sent an email touting Uranium Energy to a mailing list of a vast array of U.S. investors and published the information in the email on its website.   In the email, StockPreacher.com stated that Raven Consulting Corp. paid it $22,500 for the stock promotion. LuckyStockPicks.com, StockProfessors.com, USAMarketNews.com, and PennyStockShark.com each had stated that Raven Consulting Corp. owned them and that they were paid $5,000 *by Uranium Energy* for their stock promotions of the Company.   Yet, InvestorSoup.com, MicroStockProfit.com, and PennyStocksFinder each stated that Raven Consulting Corp. paid them $22,500 for their stock promotions. StockPreacher.com failed to disclose that it received the $22,500 indirectly from Uranium Energy or that Uranium Energy paid Raven Consulting Corp. to hire StockPreacher.com.  StockPreacher.com, in two emails it had sent on June 23, 2011 and in corresponding website publications, stated that BlueWave Advisors, not Action Media Holdings Corp., owned it, and that it was paid $30,000 by Mission IR for its stock promotion of the Company.  Additionally, Uranium Energy failed to disclose that it paid StockPreacher.com or Raven Consulting Corp. $22,500 for the stock promotion in the Company's regulatory filings with the SEC.

141.    On the same day, a company named TheLightningPicks.com, which stated that it is also owned by Action Media Holdings Corp., sent an email touting Uranium Energy to a mailing list of a vast array of U.S. investors and published the information in the email on its website.   In the email, TheLightningPicks.com stated that Raven Consulting Corp. paid it

$22,500 for the stock promotion. LuckyStockPicks.com, StockProfessors.com, USAMarketNews.com, and PennyStockShark.com each had stated that Raven Consulting Corp. owned them and that they were paid $5,000 *by Uranium Energy* for their stock promotions of the Company. Yet, InvestorSoup.com, MicroStockProfit.com, PennyStocksFinder, and StockPreacher.com each stated that Raven Consulting Corp. paid them $22,500 for their stock promotions. TheLightningPicks.com failed to disclose that it received the $22,500 indirectly from Uranium Energy or that Uranium Energy paid Raven Consulting Corp. to hire TheLightningPicks.com. Additionally, Uranium Energy failed to disclose that it paid TheLightningPicks.com or Raven Consulting Corp. $22,500 for the stock promotion in the Company's regulatory filings with the SEC.

142. On November 12, 2014, Future Money Trends sent an email touting Uranium Energy to a mailing list of a vast array of U.S. investors and published the information in the email on its website. Future Money Trends is the same company to which Shazamstocks.com stated it was a consultant. In the email, Future Money Trends stated that Uranium Energy paid it $87,000 *and* 20,000 shares of Company stock for the stock promotion. Future Money Trends did not state that it currently owned 20,000 shares of Company stock, as it had stated in its emails dated July 18, 2014, July 25, 2014, and September 10, 2014. Uranium Energy failed to disclose that it paid Future Money Trends $87,000 and 20,000 shares of Company stock for the stock promotion in the Company's regulatory filings with the SEC.

143. On February 23, 2015, Future Money Trends sent an email touting Uranium Energy to a mailing list of a vast array of U.S. investors and published the information in the email on its website. Future Money Trends is the same company to which Shazamstocks.com

stated it was a consultant.  In the email, Future Money Trends stated that Uranium Energy paid it $20,400 for the stock promotion.  Uranium Energy failed to disclose that it paid Future Money Trends $20,400 for the stock promotion in the Company's regulatory filings with the SEC.

144.    Defendants' failure to disclose the Stock Promoters' paid relationships with Uranium Energy ran afoul of Section 17(b) of the Securities Act of 1933.

145.    Section 17(b) – commonly known as the "anti-touting" provision – provides, in pertinent part, that anyone who advertises a stock, even if he does not purport to offer the security for sale, must disclose the "consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, the receipt, whether past or prospective, of such consideration and the amount thereof."  15 U.S.C. §77q(b).

146.    This anti-touting provision was enacted, in part, to "meet the evils of the 'tipster sheet' as well as articles in newspapers or periodicals that purport to give an unbiased opinion but which opinions in reality are bought and paid for."  *SEC v. Wall St. Pub. Inst., Inc.*, 851 F.2d 365, 376 (D.C. Cir. 1988) (quoting House Committee Report, H.R. Rep. No. 85, 73d Cong., 1st Sess. 6 (1933)).

147.    In an investor bulletin published by the SEC titled "Microcap Stock: A Guide for Investors," the SEC provides information about investment in microcap stocks and specifically warns of potential fraud, explaining as follows:

> Paid Promoters:  Some microcap companies pay stock promoters to recommend or "tout" the microcap stock in supposedly independent and unbiased investment newsletters, research reports, or radio and television shows . . . . The federal securities laws require the publications to disclose who paid them for the promotion, the amount, and the type of payment.  But many fraudsters fail to do so and mislead investors into believing they are receiving independent advice.

This       SEC       investor       bulletin       may       be       found       at
http://www.sec.gov/investor/pubs/microcapstock.htm.

148.     Moreover, an issuer of securities is also required to disclose the details of its
relationship with a stock promoter in its regulatory filings.  Here, Defendants' failure to disclose
the Stock Promoters' receipt of compensation directly or indirectly from the Company for
making material statements concerning Uranium Energy is considered a material omission, thus
supporting the claims of their concomitant violations of Sections 10(b) and 20(a) of the
Exchange Act.  *SEC v. Softpoint, Inc.*, 958 F.Supp. 846, 863 (S.D.N.Y. 1997); *SEC v. Scott*, 565
F.Supp. 1513, 1527 (S.D.N.Y. 1983); *SEC v. Curshen*, 372 F. App'x 872, 881 (10th Cir. 2010)
(citing *Basic, Inc. v. Levinson*, 485 U.S. 224, 232 (1988)).

149.     The Individual Defendants caused the Company to fail to maintain adequate
disclosure controls and procedures and internal control over financial reporting, which facilitated
all of the fraudulent conduct engaged in by the Individual Defendants and all of the fraudulent
public disclosures that the Individual Defendants caused the Company to make, and that they
caused or facilitated the corrupt Stock Promoters to make.

150.     The Individual Defendants caused the Company to make false and misleading
statements of material fact in their filings with the SEC that the Company's disclosure controls
and procedures and internal control over financial reporting were effective, including in the
Company's Form 10-Ks filed with the SEC on October 13, 2011, October 15, 2012, October 15,
2013, and October 14, 2014, and in the Company's Form 10-Qs filed with the SEC on June 9,
2011, December 12, 2011, March 12, 2012, June 11, 2012, December 10, 2012, March 12, 2013,

June 10, 2013, December 9, 2013, March 12, 2014, June 9, 2014, December 10, 2014, March 12, 2015, and June 9, 2015.

151.    Each of the Company's Form 10-Ks filed with the SEC on October 13, 2011, October 15, 2012, and October 15, 2013 was signed by Defendants Adnani, Katsumata, Lindsay, Obolensky, Della Volpe, and Kong.  The Company's Form 10-K filed with the SEC on October 14, 2014 was signed by Defendants Adnani, Katsumata, Lindsay, Obolensky, Della Volpe, Kong, and Mani.  Each of the Company's Form 10-Ks filed with the SEC on October 13, 2011, October 15, 2012, October 15, 2013, and October 14, 2014 was accompanied by certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Adnani and Katsumata attesting to their accuracy.

152.    Each of the Company's Form 10-Qs filed with the SEC, as set forth above, was signed by Defendants Adnani and Katsumata, and was accompanied by certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the SOX signed by Defendants Adnani and Katsumata attesting to their accuracy.

## DAMAGES TO URANIUM ENERGY

153.    As a direct and proximate result of the Individual Defendants' conduct, Uranium Energy has lost and has expended and will continue to expend many millions of dollars.

154.    Such expenditures include, but are not limited to, legal fees associated with the federal securities fraud class action lawsuit filed against the Company, Adnani, and Katsumata, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

155.    Such losses include those due to the unjust enrichment of the Individual Defendants and Company employees who were improperly over-compensated by the Company and some of whom received ill-gotten gains from insider selling.

156.    As a direct and proximate result of the Individual Defendants' conduct, Uranium Energy has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## DERIVATIVE ALLEGATIONS

157.    Plaintiff brings this action derivatively and for the benefit of Uranium Energy to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Uranium Energy and unjust enrichment, as well as the aiding and abetting thereof.

158.    Uranium Energy is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

159.    Plaintiff is, and at all relevant times has been, a Uranium Energy shareholder. Plaintiff will adequately and fairly represent the interests of Uranium Energy in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

160.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

- 56 -

161.   A pre-suit demand on the Board of Uranium Energy is futile and, therefore, excused.  At the time of filing of this action, the Board consists of the following six Individual Defendants: Adnani, Lindsay, Obolensky, Della Volpe, Kong, and Mani (collectively, the "Directors").  Plaintiff needs only to allege demand futility as to three of the six Directors that are on the Board at the time this action is commenced.

162.   Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of their scheme and false and misleading statements and omissions of material fact, which render them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

163.   In complete abdication of their fiduciary duties, the Directors either participated in or were recklessly unaware of the fraudulent scheme to inflate the Company's stock price by engaging in a scheme to manipulate the price and trading volume of Uranium Energy's stock by using stock promoters who in many cases failed to disclose to potential investors that they had been paid by the Company to promote the purchase of the stock, by failing to disclose that the Company paid stock promoters in Uranium Energy's regulatory filings pursuant to Section 17(b) of the Securities Act of 1933, and by engaging in lucrative insider sales; B) by failing to maintain for the Company adequate internal and financial controls; and C) by making and/or causing the Company to make false and misleading statements by failing to disclose to the investing public 1) the above scheme, and 2) that the Company lacked adequate internal and financial controls. All of the Directors signed SEC filings containing false and misleading statements and omissions of material fact, as set forth above.  The fraudulent scheme was intended to make the Company

appear more profitable and attractive to investors.  As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

164.    Additional reasons that demand on Defendant Adnani is futile follow.  Defendant Adnani, as the Company's co-founder, President and Chief Executive Officer is thus a non-independent director.  He was ultimately responsible for the Company's payments to the Stock Promoters, for the Stock Promoters' failure to disclose that they were paid by the Company, operations, internal controls, and all of the false and misleading statements and omissions that were made, including those contained in the SEC filings, all of which he signed.  His insider sales before the fraud was exposed that yielded net proceeds of over $318 thousand demonstrates his motive in facilitating and participating in the fraud.  His large Company stock holding -- over 3 million shares, or 3.2% of, Company stock -- reveals his interest in keeping the Company stock price as high as possible.  Also, Defendant Adnani is the chairman, founder, and controlling shareholder of Brazil Resources, Inc., which, according to one of the stock promotion emails, paid one of the Stock Promoters in 2014 for its stock promotion of Uranium Energy, as alleged herein.  Defendant Kong and Company executive Pat Obara also have director and officer positions, respectively, at Brazil Resources, Inc., a publicly traded Canadian company that, according to its public filings, engages in the acquisition, exploration and development of mineral properties in Brazil, and that is NOT in the business of promoting other companies' stock.  The stock promotion paid by Brazil Resources, Inc. did not disclose that it was paid for by a company related to Uranium Energy or that it was paid for by Uranium Energy, and Uranium Energy failed to disclose the same in its regulatory filings with the SEC.  Obviously the

stock promotion paid for by Brazil Resources, Inc. attempted to conceal that it was paid for by Uranium Energy or its affiliate; but, of the 43 stock promotions detailed herein, this stock promotion's attempted cover-up was done extremely carelessly, thus exposing that the Individual Defendants, especially Defendants Adnani and Kong, knowingly engaged in the stock manipulation scheme, as alleged herein, with every single one of the Stock Promoters. Moreover, Defendant Adnani is a defendant in the securities fraud class action lawsuit. Finally, Defendant Adnani conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the corrupt stock promotion scheme and scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, too, Defendant Adnani breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

165.    Additional reasons that demand on Defendant Lindsay is futile follow. Defendant Lindsay is the Company's co-founder, Chairman and owner of 2.49 million shares, or 2.7% of, Company stock, which reveals his interest in keeping the Company stock price as high as possible. Only three persons employed by Uranium Energy received higher compensation than Defendant Lindsay in the fiscal year ended July 31, 2014. Indeed, the Company in its SEC filings admits that Defendant Lindsay is a non-independent director. Defendant Lindsay was responsible for all of the false and misleading statements and omissions that were made in the Company's Form 10-Ks, which he signed, as alleged herein. Finally, Defendant Lindsay conducted little, if any, oversight of the Company's internal controls over public reporting of

financial statements and of the Company's engagement in the corrupt stock promotion scheme and scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  Thus, for these reasons, too, Defendant Lindsay breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

166.    Additional reasons that demand on Defendant Kong is futile follow.  Defendant Kong owns 96 thousand shares of Company stock, which reveals his interest in keeping the Company stock price as high as possible.   Defendant Kong was responsible for all of the false and misleading statements and omissions that were made in the Company's Form 10-Ks, which he signed, as alleged herein.  Also, Defendant Kong is one of six directors of Brazil Resources, Inc., which, according to one of the stock promotion emails, paid one of the Stock Promoters in 2014 for its stock promotion of Uranium Energy, as alleged herein.  Defendant Adnani is the chairman, founder, and controlling shareholder of Brazil Resources, Inc.  Moreover, Company executive Pat Obara is an officer at Brazil Resources, Inc.  Brazil Resources, Inc. is a publicly traded Canadian company that, according to its public filings, engages in the acquisition, exploration and development of mineral properties in Brazil, and that is NOT in the business of promoting other companies stock.  The stock promotion paid by Brazil Resources, Inc. did not disclose that it was paid for by a company related to Uranium Energy or that it was paid for by Uranium Energy, and Uranium Energy failed to disclose the same in its regulatory filings with the SEC.  Obviously the stock promotion paid for by Brazil Resources, Inc. attempted to conceal that it was paid for by Uranium Energy or Uranium Energy's affiliate; but, of the 43 stock

promotions detailed herein, this stock promotion's attempted cover-up was done extremely carelessly, thus exposing that the Individual Defendants, especially Defendants Adnani and Kong, knowingly engaged in the stock manipulation scheme, as alleged herein, with every single one of the Stock Promoters.  Finally, Defendant Kong, as a Director and Chairman of the Company Audit Committee, conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the corrupt stock promotion scheme and scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  Thus, for these reasons, too, Defendant Kong breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

167.    Additional reasons that demand on Defendant Obolensky is futile follow. Defendant Obolensky owns 218 thousand shares of Company stock, which reveals his interest in keeping the Company stock price as high as possible.  Defendant Obolensky was responsible for all of the false and misleading statements and omissions that were made in the Company's Form 10-Ks, which he signed, as alleged herein.  Finally, Defendant Obolensky, as a Director and member of the Company Audit Committee, conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the corrupt stock promotion scheme and scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  Thus, for these reasons, too, Defendant Obolensky breached his fiduciary duties, faces a substantial likelihood of

liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

168.    Additional reasons that demand on Defendant Della Volpe is futile follow. Defendant Della Volpe owns 238 thousand shares of Company stock, which reveals his interest in keeping the Company stock price as high as possible.  Defendant Della Volpe was responsible for all of the false and misleading statements and omissions that were made in the Company's Form 10-Ks, which he signed, as alleged herein.  Finally, Defendant Della Volpe, as a Director and member of the Company Audit Committee, conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the corrupt stock promotion scheme and scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, too, Defendant Della Volpe breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

169.    Additional reasons that demand on Defendant Mani is futile follow.  Defendant Mani owns 50 thousand shares of Company stock, which reveals his interest in keeping the Company stock price as high as possible.  Defendant Mani was responsible for all of the false and misleading statements and omissions that were made in the Company's Form 10-K filed with the SEC on October 14, 2014, which he signed, as alleged herein.  Finally, Defendant Mani, as a Director, conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the corrupt stock

promotion scheme and scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  Thus, for these reasons, too, Defendant Mani breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

170.    Furthermore, demand in this case is excused because the Directors, who are named as defendants in this action, control the Company and are beholden to each other.  The Board is especially beholden to Defendants Adnani, Lindsay, and Katsumata, who have been top leaders of Uranium Energy, and, in the cases of Defendants Adnani and Linsday, have been substantial Company shareholders.

171.    The Directors, as members of the Board, were and are subject to the Code of Ethics.  The Code of Ethics goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations.  The Code of Ethics requires the Directors to also adhere to Uranium Energy's standards of business conduct.  The Code of Ethics requires all employees, officers and directors to avoid activities or relationships that conflict with the Company's interests or adversely affect the Company's reputation.  The Directors did not comply with the requirements of the Code of Ethics.  The Directors violated the Code of Ethics because they participated in or were recklessly unaware of the fraudulent scheme to inflate the Company's stock price.  Because the Directors violated the Code of Ethics, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

172.    The Directors also breached their fiduciary duty of loyalty by failing to ensure that the Company had an adequate system of internal controls in place to prevent the

misrepresentations made by the Individual Defendants and the corrupt stock promoters and to prevent the scheme to artificially inflate the Company stock price. Indeed, the Directors knowingly or recklessly disregarded any such controls by causing and facilitating the scheme. Accordingly, the Directors breached their fiduciary duties in failing to implement such internal controls and, therefore, face a substantial likelihood of liability, and demand upon them is futile.

173.   The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

174.   Uranium Energy has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Uranium Energy any part of the damages Uranium Energy suffered and will continue to suffer thereby. Thus, any demand on the Directors would be futile.

175.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgments as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of

exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

176.    The acts complained of herein constitute violations of fiduciary duties owed by Uranium Energy's officers and directors, and these acts are incapable of ratification.

177.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Uranium Energy.  If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion."  As a result, if the Directors were to sue themselves or certain of the officers of Uranium Energy, there would be no directors' and officers' insurance protection.  Accordingly, the Directors cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Directors is futile and, therefore, excused.

178.    If there is no directors' and officers' liability insurance, then the Directors will not cause Uranium Energy to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

179.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, certainly at least three of the Directors, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

180.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

181.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Uranium Energy's business and affairs.

182.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

183.    The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Uranium Energy.

184.    In breach of their fiduciary duties owed to Uranium Energy, the Individual Defendants willfully participated in misrepresentation of the Company's business operations and prospects, failed to correct the Company's public statements and corrupt stock promoters' public statements about the Company, and failed to properly oversee Uranium Energy's business and internal controls, rendering them personally liable to the Company for breaching their fiduciary duties.

185.    The Individual Defendants had actual or constructive knowledge that that they had caused the Company to improperly misrepresent its business operations and prospects and they failed to correct the Company's public statements and corrupt stock promoters' public statements about the Company.   The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.   Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Uranium Energy's securities and disguising insider sales and self-dealing transactions.

186.    The Individual Defendants had actual or constructive knowledge that that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls.  The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them.   Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Uranium Energy's securities and engaging in insider sales and self-dealing transactions.

187.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

188.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Uranium Energy has sustained and continues to sustain significant

damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## SECOND CLAIM

### Against Individual Defendants for Unjust Enrichment

189.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

190.    By their wrongful acts and the omissions of material fact that they caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Uranium Energy.

191.    The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales and received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Uranium Energy that was tied to the performance or artificially inflated valuation of Uranium Energy, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

192.    Plaintiff, as a shareholder and a representative of Uranium Energy, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Uranium Energy, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Uranium Energy;

(c)     Determining and awarding to Uranium Energy the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Uranium Energy and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Uranium Energy and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Uranium Energy to nominate at least three candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance

- 69 -

with applicable laws, rules, and regulations.

        (e)    Awarding Uranium Energy restitution from Individual Defendants, and each of them;

        (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

        (g)    Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: September 10, 2015          Respectfully submitted,

By:    */s/ Richard E. Norman*
Richard E. Norman
**CROWLEY NORMAN LLP**
State Bar No. 00788128
Federal I.D. No. 17424
Three Riverway, Suite 1775
Houston, Texas 77056
Telephone: (713) 651-1771
Facsimile: (713) 651-1775
Email: rnorman@crowleynorman.com

*Liaison Counsel for Plaintiff*


**THE BROWN LAW FIRM, P.C.**
Timothy W. Brown *(Pro Hac Vice Application to be filed)*
New York Bar No. 4301495
127A Cove Road
Oyster Bay Cove, New York 11771
Telephone: (516) 922-5427
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

- 71 -

## VERIFICATION

I, John Price, am the plaintiff in the within action and am a citizen of the State of Iowa. I have read the foregoing complaint and know the contents thereof. The allegations of the complaint are true of my personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 12th day of August 2015.

_____
John Price